UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC,                )
                                    )
        Plaintiff,                  )
                                    )
        v.                          )        Civ. A. No. 1:19-cv-00177-EGS
                                    )
U.S. DEPARTMENT OF JUSTICE,         )
                                    )
        Defendant.                  )
                                    )

## DECLARATION OF MICHAEL G. SEIDEL

I, Michael G. Seidel, declare as follows:

(1)     I am currently the Section Chief of the Record/Information Dissemination Section

("RIDS"), Information Management Division ("IMD"), Federal Bureau of Investigation ("FBI"),

Winchester, Virginia. I joined the FBI in September 2011, and prior to my current position, I

was the Assistant Section Chief of RIDS from June 2016 to July 2020; Unit Chief, RIDS

Litigation Support Unit from November 2012 to June 2016; and an Assistant General Counsel,

FBI Office of General Counsel, Freedom of Information Act ("FOIA") Litigation Unit, from

September 2011 to November 2012. In those capacities, I had management oversight or agency

counsel responsibility for FBI FOIA and Privacy Act ("FOIPA") litigation cases nationwide.

Prior to my joining the FBI, I served as a Senior Attorney, U.S. Drug Enforcement

Administration ("DEA") from September 2006 to September 2011, where among myriad legal

responsibilities, I advised on FOIPA matters and served as agency counsel representing the DEA

in FOIPA suits nationwide. I also served as a U.S. Army Judge Advocate General's Corps

Officer in various assignments from 1994 to September 2006 culminating in my assignment as

Chief, General Litigation Branch, U.S. Army Litigation Division where I oversaw FOIPA

1

litigation for the U.S. Army.  I am an attorney registered in the State of Ohio and the District of Columbia.

(2)     In my official capacity as Section Chief of RIDS, I supervise approximately 235 FBI employees, supported by approximately 94 contractors, who staff a total of twelve (12) Federal Bureau of Investigation Headquarters ("FBIHQ") units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives.  The statements contained in this declaration are based on my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to Plaintiff's request for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. §552a. Specifically, I am aware of the FBI's handling of Plaintiff's FOIA request for records related to communications on or after January 1, 2016, between former FBI General Counsel James Baker and Christopher Steele, Glenn Simpson, Nellie Ohr, or David Corn.

(4)     In response to Plaintiff's request, the FBI processed a total of 28 pages of responsive records subject to the FOIA.  Of the twenty-eight (28) pages, twenty-one (21) pages were released in full, four (4) pages were released in part, and three (3) pages were duplicates of another page processed and released to Plaintiff in part.  In accordance with *Vaughn v. Rosen*,

414 F.2d 820 (D.C. Cir. 1973), this declaration is being submitted in support of Defendant's

motion for summary judgment, and provides the Court with information concerning the

following: a) the administrative history of Plaintiff's request; b) the FBI's *Glomar* position with

regard to certain third parties' information; c) the FBI's recordkeeping system; d) the procedures

used to search for, review, and process the responsive records; and e) the FBI's justifications for

withholding information pursuant to FOIA Exemptions 3, 6, 7(C), and 7(E), 5 U.S.C.

§§ 552(b)(3), (b)(6), (b)(7)(C), and (b)(7)(E).[1]

## ADMINISTRATIVE HISTORY OF PLAINTIFF'S REQUEST
## FBI FOIPA REQUEST NUMBER 1393291-000

(5)     By certified letter dated January 5, 2018, Plaintiff submitted a FOIA request to the

FBI seeking records pertaining to:

> Any and all records of communication, including but not limited to emails, text messages
> and instant chats, sent between former FBI General Counsel James Baker and any of the
> following individuals: former British intelligence officer Christopher Steele, principal of
> Orbis Business Intelligence, Ltd.; Glenn Simpson of Fusion GPS; former Fusion GPS
> contractor Nellie Ohr; and/or David Corn, a reporter with *Mother Jones* magazine.

The time frame for the requested records was January 1, 2016 to present. Plaintiff also requested

a waiver of all fees associated with the processing of their request. **(Ex. A.)**

(6)     By letter dated January 16, 2018, the FBI acknowledged receipt of Plaintiff's

FOIA request, and notified Plaintiff it had assigned it FBI FOIPA Request Number 1393291.

The FBI also acknowledged receipt of the Plaintiff's request for a public interest fee waiver and

advised Plaintiff that its request was under consideration and that Plaintiff would be advised of

the decision at a later date. Plaintiff was further advised that if their request for a fee waiver was

not granted, as a representative of the news media, Plaintiff would be charged applicable

---

[1] Upon further review of the records, the FBI is no longer asserting Exemptions (b)(5), (b)(7)(A),
or (b)(7)(D).

duplication fees. Additionally, the FBI informed Plaintiff it could check the status of its request

and/or contact the FBI with any questions at www.fbi.gov/foia. Furthermore, Plaintiff could

appeal the FBI's response to the DOJ, Office of Information Policy ("OIP") within ninety (90)

days of its letter, contact the FBI's FOIA public liaison, and or seek dispute resolution services

by contacting the Office of Government Information Services ("OGIS"). **(Ex. B.)**

(7)     As described below in paragraphs 56 and 57, RIDS first conducted a search of the

unclassified e-mail account of James Baker for records responsive to this request. The search

returned no responsive records.

(8)     By letter dated July 25, 2018, the FBI informed Plaintiff it had conducted a search

of the places reasonably expected to have records, but that it was unable to identify records

responsive to Plaintiff's request. (At that point, the FBI had only searched the unclassified email

account of James Baker.) Additionally, the FBI informed Plaintiff that it was not necessary to

adjudicate its request for a fee waiver, as no fees were being assessed. Further, Plaintiff was

advised that it could appeal the FBI's response to the DOJ, OIP within ninety (90) days of its

letter, contact the FBI's public liaison, and or seek dispute resolution services by contacting the

OGIS. In sending the letter of July 25, 2018, the FBI inadvertently acknowledged the non-

existence of responsive investigative records in James Baker's unclassified email account. The

FBI does not now contest the fact that it has made this official acknowledgement. **(Ex. C.)**

(9)     By letter dated August 14, 2018, Plaintiff filed an appeal with DOJ/OIP,

challenging the FBI's July 25, 2018 determination. **(Ex. D.)**

(10)     By letter dated August 28, 2018, OIP acknowledged receipt of Plaintiff's appeal

and informed Plaintiff it assigned appeal number DOJ-AP-2018-007890 to its appeal. **(Ex. E.)**

(11)    Plaintiff filed its Complaint in the instant action on January 25, 2019. (ECF No.

1.)

(12)    OIP responded to Plaintiff's appeal by e-mailed letter dated March 1, 2019. OIP

advised Plaintiff it closed Plaintiff's appeal because it determined Plaintiff filed a lawsuit

concerning the FBI's actions. Department of Justice regulations located at 28 C.F.R.

§ 16.8(b)(2) (2018) states an appeal will not ordinarily be acted upon by OIP once the FOIA

request becomes the subject of litigation. **(Ex. F.)**

(13)    RIDS then conducted a second search, which is described below in paragraphs 50

through 52. This second search was a CRS index search for potentially responsive records,

employing the Sentinel indices, for main file records indexed to James Baker.

(14)    By letter dated September 20, 2019, the FBI advised Plaintiff of the following:

> To the extent that your request seeks 1) investigative records that have previously been
> officially, publicly acknowledged; 2) investigative records that have not been officially,
> publicly acknowledged, but whose existence or non-existence could be acknowledged
> without causing any harm protected by a FOIA Exemption; and 3) administrative records,
> we have conducted a search of the places reasonably expected to have records. However,
> we were unable to identify records responsive to your request.

Additionally, the FBI advised:

> To the extent that your request seeks investigative records that have not previously been
> officially, publicly acknowledged and the existence or non-existence of which could not
> be acknowledged without causing any protected harm, the FBI can neither confirm nor
> deny the existence of records responsive to your request pursuant to FOIA Exemptions
> (b)(6), (b)(7)(C), and (b)(7)(E).[2]

Although the request is in litigation, the FBI informed Plaintiff it could appeal the FBI's

response to the DOJ, OIP within ninety (90) days of its letter, seek dispute resolution services by

contacting OGIS, or contact the Attorney representing the Government in the matter. **(Ex. G.)**

---

[2] The FBI is no longer asserting FOIA Exemption (b)(7)(E) as a basis for its *Glomar*.

(15)    Although this letter did not specifically discuss email records, the unclassified e-mail account of James Baker was searched before the FBI sent its letter dated July 25, 2018, which officially acknowledged that the account contained no responsive records.

(16)    As of September 20, 2019, therefore, the FBI had officially acknowledged the non-existence of responsive records a) in the unclassified email account of James Baker; b) among the administrative records in its CRS database, indexed to James Baker; c) among the investigative records in its CRS database, indexed to James Baker, that had previously been officially, publicly acknowledged, and d) among the investigative records in its CRS database, indexed to James Baker, that had not been officially, publicly acknowledged, but whose existence or non-existence could be acknowledged without causing any harm protected by a FOIA Exemption.  The FBI had not acknowledged the existence or non-existence of investigative records a) outside of the unclassified email account of James Baker; b) that had not previously been officially, publicly acknowledged; and c) the existence or non-existence of which could not be acknowledged without causing any protected harm.

(17)    After the December 2019 publication of a report by the Office of the Inspector General of the U.S. Department of Justice, discussed below in paragraph 58, RIDS conducted a third search for responsive records.  This search consisted of two parts: a Sentinel indices search utilizing the name James Baker, which was restricted to records indexed as FD-302s, and a search of Baker's and E. W. Priestap's unclassified FBI e-mail accounts.

(18)    By letter dated June 15, 2020, the FBI advised Plaintiff that material consisting of 28 pages was reviewed pursuant to Title 5, U.S.C. § 552, and withheld in its entirety pursuant to FOIA Exemptions (b)(3), (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).[3]  Plaintiff

---

[3] The FBI is no longer asserting Exemptions (b)(5), (b)(7)(A), or (b)(7)(D).  *See* Footnote 1.

was provided deleted page information sheets representing the records Bates numbered FBI(19cv00177)-1 through FBI(19cv00177)-28 and advised this was the FBI's final release of information responsive to its request. Further, Plaintiff was advised it could appeal the FBI's determination to DOJ, OIP within ninety (90) days from the date of its letter. **(Ex. H.)**

(19)   By letter dated September 4, 2020, the FBI provided a supplemental release to Plaintiff, wherein the FBI advised Plaintiff that during its review of the 28 pages previously withheld in full, in preparation for briefing, it determined that 21 pages could be released in full, and 4 released in part, and that the remaining 3 pages were duplicates of a page released in part. Further, Plaintiff was advised it could appeal the FBI's determination to DOJ, OIP within ninety (90) days from the date of its letter.   **(Ex. I.)**

## LIMITED *GLOMAR* RESPONSES

(20)   The FOIA exempts from disclosure records related to third parties if release of the information could be expected to constitute an unwarranted invasion of personal privacy.

(21)   Specifically, the FOIA provides as follows:

5 U.S.C. § 552(b)(6) exempts from disclosure:

personnel and medical files and similar files when the disclosure of such information would constitute a clearly unwarranted invasion of personal privacy.

5 U.S.C. § 552(b)(7)(C) exempts from disclosure:

Records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy.[4]

---

[4] The practice of the FBI is to assert Exemption (b)(6) in conjunction with Exemption (b)(7)(C). Although the balancing test for Exemption (b)(6) uses a "would constitute a clearly unwarranted invasion of personal privacy" standard, and the test for Exemption (b)(7)(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion. The privacy interests are balanced against the public's interest in disclosure under the analysis of both exemptions.

(22)     Exemption 7 of the FOIA protects from mandatory disclosure records or information compiled for law enforcement purposes, but only to the extent the disclosure could reasonably be expected to cause one of the harms enumerated in the subpart of the exemption. Before an agency can invoke any of the harms enumerated in exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes.  Law enforcement agencies such as the FBI must demonstrate that the records at issue are related to the enforcement of federal laws and that the enforcement activity is within the law enforcement duty of that agency.

(23)     Investigative records, should any exist, would have been collected and maintained by the FBI as part of its law enforcement mission.  The FBI's responsibilities include the investigation of violations of criminal laws of the United States and collection of evidence in cases in which the United States is or may be a party in interest. *See* also 28 C.F.R. § 0.85.  Any non-administrative communications by Mr. Baker with these third parties would be investigative records.  The email between Mr. Baker and Mr. Corn, which was produced in response to this FOIA request because it had been officially acknowledged, is an example of such a non-administrative communication: Mr. Corn sent documents of investigative interest to Mr. Baker, who forwarded them to Mr. Priestap for analysis.

(24)     If such investigative records exist, they would have been created for law enforcement purposes and would relate directly to the FBI's investigation of violations of the United States Code for which the FBI has investigative responsibility.  Accordingly, any responsive investigative records would readily meet the threshold requirement of FOIA exemption (b)(7), should they exist.

(25)   A privacy *Glomar* is necessary pursuant to 5 U.S.C. § 552(b)(6) and (b)(7)(C) because members of the public are likely to draw adverse inferences from the mere fact that an individual is mentioned in the files of a law enforcement agency such as the FBI or has engaged in meetings or communications with FBI employees, as this may cast the individual in an unfavorable or negative light.  Moreover, release of the names and/or other personal information about third parties could cause unsolicited and unnecessary attention or harassment to be focused on them.  Individuals—whether they are the subject of an investigation, witnesses, or law enforcement personnel—have a strong interest in not being associated unwarrantedly with alleged or actual criminal activity.  These individuals maintain a strong privacy interest in not having their personal information disclosed.

(26)   The FBI's long standing policy has been to provide an Exemptions (b)(6) and (b)(7)(C) *Glomar* response (hereinafter "privacy *Glomar*"), neither confirming nor denying the existence of records, in those instances where a requester seeks access to information regarding a third party but fails to provide: 1) a privacy waiver from the third party; 2) proof of death of that third party as described in the regulation at 28 C.F.R. § 16.3(a); or 3) sufficient evidence of a significant public interest in disclosure of the material sought.[5]  The FBI asserted a partial privacy *Glomar* in this case regarding certain investigative records.

(27)   The FBI typically does not assert a privacy *Glomar* regarding investigative records referencing FBI employees in the senior executive service, who are acting in their

---

[5] The phrase "*Glomar* response" stems from a case in which a FOIA requester sought information concerning a ship named the *Hughes Glomar Explorer*, and the CIA refused to confirm or deny its relationship with the *Glomar* vessel because to do so would compromise the national security or divulge intelligence sources and methods. *Phillipi v. CIA*, 655 F.2d 1325 (D.C. Cir. 1981).  *Glomar* responses are proper "if the fact of the existence or nonexistence of agency records falls within a FOIA exemption." *Wolf v. C.I.A.*, 473 F.3d 370, 374 (D.C. Cir. 2007).

official capacity. For that reason, in this case the FBI does not assert a privacy *Glomar* for such records regarding former General Counsel Baker, but does assert a privacy *Glomar* for investigative records regarding the other third parties listed.

(28)     However, the FBI is aware of the official, public acknowledgement that Christopher Steele served as a confidential human source and communicated with the FBI in relation to the Crossfire Hurricane investigation. Because of that official acknowledgement, Mr. Steele has no further privacy interest in the existence of any communications he may have had with Mr. Baker regarding that investigation or his service as a CHS. If the FBI had found such responsive records, it would have produced any non-exempt portions of them. But the FBI found none.

(29)     Similarly, the FBI is aware of the official, public acknowledgement that Mr. Corn communicated with Mr. Baker in relation to the Crossfire Hurricane investigation; the FBI does not assert a privacy *Glomar* over these officially, publicly acknowledged communications.

(30)     The scope of the FBI's privacy *Glomar* is as follows: any investigative records of communications between James Baker and Nellie Ohr or Glenn Simpson outside of Mr. Baker's unclassified email account; any investigative records of communications between James Baker and David Corn outside of Mr. Baker's unclassified email account, apart from the officially, publicly acknowledged communications related to the Crossfire Hurricane investigation; and any investigative records of communications between James Baker and Christopher Steele outside of Mr. Baker's unclassified email account, unless such communications concerned the Crossfire Hurricane investigation or Mr. Steele's service as a CHS.

(31)     Should any investigative records within the scope of the FBI's privacy *Glomar* exist, they would presumably have been collected and maintained by the FBI as part of its law

enforcement mission. The FBI's responsibilities include the investigation of violations of criminal laws of the United States and collection of evidence in cases in which the United States is or may be a party in interest. (28 C.F.R. § 0.85.) Any investigative records the FBI would have related to these individuals, if such records exist, would have been created for law enforcement purposes and would relate directly to, and be the product of, the FBI's investigation of violations of the United States Code for which the FBI has investigative responsibility.

(32)  After identifying the substantial privacy interests of third parties, the FBI balances those interests against the public interest in disclosure and evaluates—on a case-by-case basis— whether significant public benefit would result from the disclosure of the requested records. The relevant "public interest" under the FOIA is whether the requested records, if they were to exist, shed light on the activities of the FBI and show "what the Government is up to." If a significant public interest outweighs the substantial privacy interests of the subject(s) of the request, or if certain information about a third party has already been officially acknowledged, the FBI will typically "pierce" the privacy *Glomar* and acknowledge the existence of responsive files. In most cases, there is no discernable public interest in disclosure of such information.

(33)  As to the records requested in this litigation, because disclosure of the existence of information in FBI investigative files regarding the specific third parties does not particularly shed light on the activities of the FBI, there is a negligible public interest. As a result, when this negligible public interest is balanced against the third parties' substantial privacy interests, disclosure would constitute an unwarranted invasion of their personal privacy—indeed, a clearly unwarranted invasion.

(34)     To the extent Plaintiff seeks communications between Mr. Baker and the specific

third parties within the scope of the FBI's privacy *Glomar*, the FBI can neither confirm nor deny

existence of such records, pursuant to FOIA Exemptions (b)(6) and (b)(7)(C).

(35)     Given that Plaintiff failed to provide a privacy waiver or proof of death, the FBI

denied Plaintiff's request for records concerning Mr. Baker's alleged communications with these

specific third parties, subject to the limited acknowledgement herein.  Should any additional

records exist, these third parties have strong privacy interests related to the acknowledgement of

information about them, and Plaintiff has not shown authorization by the third parties allowing

acknowledgement or receipt of such information.

(36)     Plaintiff has also failed to establish an overriding public interest in disclosure.

Plaintiff has not provided information to indicate that, if such records existed, they would be in

the public interest.  The relevant public interest, under FOIA, is to shed light on government

conduct.  Even if such records existed, Plaintiff failed to support its conclusory claim the records

would shed light on the operations and activities of the government with any explanation of how

these particular records would do so.

(37)     RIDS used a specific process to determine whether to search for or release third-

party information.  Here, Plaintiff failed to provide any information to support a conclusion that

these third parties' privacy interests are outweighed by the public's interest in disclosure.  As

such, Plaintiff did not provide sufficient information to support a claimed public interest;

therefore, Plaintiff's claimed public interest is insufficient to justify invading the third parties'

privacy interests. The FBI weighed the negligible public interest, as described *supra*, and

determined that confirming or denying the existence of any communications Baker did or did not

have with these third parties, except as described herein, is insufficient to justify invading the

third parties' privacy interests.  Therefore, the FBI determined that confirming or denying the existence of FBI law enforcement records of communications between Mr. Baker and the third parties would constitute a clearly unwarranted invasion of their personal privacy pursuant to FOIA exemption (b)(6) and could reasonably be expected to constitute an unwarranted invasion of their personal privacy pursuant to FOIA exemption (b)(7)(C).

## THE FBI'S CENTRAL RECORDS SYSTEM

(38)    The Central Records System ("CRS") is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI in the course of fulfilling its integrated missions and functions as a law enforcement, counterterrorism, and intelligence agency to include performance of administrative and personnel functions.  The CRS spans the entire FBI organization and encompasses the records of FBI Headquarters ("FBIHQ"), FBI Field Offices, and FBI Legal Attaché Offices ("Legats") worldwide.

(39)    The CRS consists of a numerical sequence of files, called FBI "classifications," which are organized according to designated subject categories.  The broad array of CRS file classification categories includes types of criminal conduct and investigations conducted by the FBI, as well as categorical subjects pertaining to counterterrorism, intelligence, counterintelligence, personnel, and administrative matters.  For identification and retrieval purposes across the FBI, when a case file is opened, it is assigned a Universal Case File Number ("UCFN") consisting of three sequential components: (a) the CRS file classification number, (b) the abbreviation of the FBI Office of Origin ("OO") initiating the file, and (c) the assigned individual case file number for that particular subject matter.[6]  Within each case file, pertinent

_____

[6] For example, in a fictitious file number of "11Z-HQ-56789;" the "11Z" component indicates

documents of interest are "serialized," or assigned a document number in the order which the document is added to the file, typically in chronological order.

### THE CRS GENERAL INDICES AND INDEXING

(40)     The general indices to the CRS are the index or "key" to locating records within the enormous amount of information contained in the CRS. The CRS is indexed in a manner which meets the FBI's investigative needs and priorities and allows FBI personnel to reasonably and adequately locate pertinent files in the performance of their law enforcement duties. The general indices are arranged in alphabetical order and comprise an index on a variety of subject matters to include individuals, organizations, events, or other subjects of investigative interest that are indexed for future retrieval. The entries in the general indices fall into two category types:

A. <u>Main entry</u>. A main index entry is created for each individual or non-individual that is the subject or focus of an investigation. The main subject(s) are identified in the case title of most documents in the file.

B. <u>Reference entry</u>. A reference index entry is created for individuals or non-individuals associated with the case but are not the main subject(s) or focus of an investigation. Reference subjects are typically not identified in the case title of a file.

(41)     FBI employees may index information in the CRS by individual (persons), by organization (organizational entities, places, and things), and by event (*e.g.,* a terrorist attack or bank robbery). Indexing information in the CRS is done at the discretion of FBI investigators when information is deemed of sufficient significance to warrant indexing for future retrieval.

---

the file classification, "HQ" indicates that FBI Headquarters is the FBI OO of the file, and "56789"is the assigned case specific file number.

Accordingly, the FBI does not index every individual name or other subject matter in the general indices.

AUTOMATED CASE SUPPORT

(42)    Automated Case Support ("ACS") was an electronic, integrated case management system that became effective for FBIHQ and all FBI Field Offices and Legats on October 1, 1995.  As part of the ACS implementation process, over 105 million CRS records were converted from automated systems previously utilized by the FBI into a single, consolidated case management system accessible by all FBI offices.  ACS had an operational purpose and design to enable the FBI to locate, retrieve, and maintain information in its files in the performance of its myriad missions and functions.[7]

(43)    The Universal Index ("UNI") was the automated index of the CRS and provided all offices of the FBI a centralized, electronic means of indexing pertinent investigative information to FBI files for future retrieval via index searching.  Individual names were recorded with applicable identifying information such as date of birth, race, sex, locality, Social Security Number, address, and/or date of an event.  Moreover, ACS implementation built upon and incorporated prior automated FBI indices; therefore, a search employing the UNI application of ACS encompassed data that was already indexed into the prior automated systems superseded by ACS.  As such, a UNI index search in ACS was capable of locating FBI records created before its 1995 FBI-wide implementation in both paper and electronic format.[8]

---

[7] ACS was and the next generation Sentinel system is relied upon by the FBI daily to fulfill essential functions such as conducting criminal, counterterrorism, and national security investigations; background investigations; citizenship and employment queries, and security screening, to include Presidential protection.

[8] Older CRS records that were not indexed into UNI as a result of the 1995 ACS consolidation remain searchable by manual review of index cards, known as the "manual indices."

## ACS AND SENTINEL

(44)    Sentinel is the FBI's next generation case management system that became effective FBI-wide on July 1, 2012.  Sentinel provides a web-based interface to FBI users, and it includes the same automated applications that were utilized in ACS.  After July 1, 2012, all FBI generated records are created electronically in case files via Sentinel; however, Sentinel did not replace ACS and its relevance as an important FBI search mechanism.  Just as pertinent information was indexed into UNI for records generated in ACS before July 1, 2012, when a record is generated in Sentinel, information is indexed for future retrieval.

(45)    On August 1, 2018, the ACS case management system was decommissioned, and ACS data was migrated into Sentinel including the ACS indices data and digitized investigative records formerly available in ACS.  Moreover, Sentinel retains the index search methodology and function whereby the CRS is queried via Sentinel for pertinent indexed main or reference entries in case files.  All CRS index data from the UNI application previously searched via ACS is now searched through the "ACS Search" function within Sentinel.

(46)    Upon receipt of FOIPA requests where the subject matter predates the implementation of Sentinel, RIDS predominately begins its FOIPA searching efforts by conducting index searches via the "ACS Search" function in Sentinel.  RIDS then builds on its ACS index search by conducting an index search of Sentinel records to ensure it captures all relevant data indexed after the implementation of Sentinel.  The CRS automated indices, available within Sentinel and the ACS search function in Sentinel, in most cases represent the most reasonable means for the FBI to locate records potentially responsive to FOIPA requests. This is because these automated indices offer access to a comprehensive, agency-wide set of indexed data on a wide variety of investigative and administrative subjects.  Currently, these

16

automated indices consist of millions of searchable records and are updated daily with material newly indexed in Sentinel.

(47)    Additionally, the location of records indexed to the subject of a FOIPA request does not automatically mean the indexed records are responsive to the subject.  Index searches are the means by which potentially responsive records are located, but ultimately, a FOIPA analyst must consider potentially responsive indexed records against the specific parameters of individual requests.  Responsiveness determinations are made once indexed records are gathered, analyzed, and sorted by FOIPA analysts who then make informed scoping decisions to determine the total pool of records responsive to an individual request.

THE FBI'S CRS SEARCH

(48)    <u>Main and Reference Files</u>.  RIDS conducted a CRS search to locate any "main" files or "reference" files potentially responsive to Plaintiff's request and not subject to the FBI's partial *Glomar* response.

(49)    <u>Index Searching</u>.  To locate CRS information, RIDS employs an index search methodology.  Index searches of the CRS are reasonably expected to locate responsive material within the vast CRS since the FBI indexes pertinent information into the CRS to facilitate retrieval to serve its primary law enforcement and intelligence gathering functions.  Given the broad range of indexed material in terms of both time frame and subject matter that it can locate in FBI files, the FBI automated indices available through Sentinel is the mechanism RIDS employs to conduct CRS index searches.

(50)    <u>CRS Searches and Results</u>.  In response to Plaintiff's request, RIDS conducted a CRS index search for potentially responsive records employing the Sentinel indices.  The FBI utilized only the Sentinel indices because Plaintiff's subject implicates records that would have

been created after the implementation of Sentinel on July 1, 2012. RIDS conducted a string search utilizing the names James Baker, James A. Baker, and Jim Baker. The FBI limited the time frame of the search to records created January 1, 2016 through January 16, 2018.

(51)    The FBI located no administrative records responsive to Plaintiff's request.

(52)    The FBI located no investigative records that were then outside the scope of its privacy *Glomar* and responsive to Plaintiff's request. At the time of this search, communications between James Baker and David Corn regarding the Crossfire Hurricane investigation had not been officially, publicly acknowledged. The existence of such communications was therefore within the scope of the FBI's privacy *Glomar* at that time.

(53)    <u>Scope of Searches</u>. Given that CRS index searches can effectively locate a broad array of FBI records, as standard practice, the FBI normally relies on index searches of the CRS to conduct reasonable searches for records responsive to FOIPA requests. While it is FBI policy to upload all substantive, record communications within the CRS, it is difficult to conduct an index search for internal communications when there is not a specific investigation identified and records could span multiple investigations.

## THE FBI'S SEARCH FOR RESPONSIVE E-MAIL RECORDS

### THE NATURE OF FBI E-MAIL RECORDS

(54)    FBI e-mail communications are stored within the separate e-mail accounts of FBI employees. These accounts include all e-mails sent to or from the specific employees. Typically FBI employees have two e-mail accounts – one unclassified e-mail account capable of communicating internally, with other government agencies ("OGAs"), with other branches of the United States Government, and with the public/non-governmental entities; and one classified account to communicate up to the "SECRET" classification level, able to communicate

internally, with OGAs, and with other branches of the United States Government. Due to this structure, the FBI must first identify likely custodians of responsive records, and whether communications are likely to be stored within their unclassified and/or classified accounts.

(55)   Once likely custodians and appropriate accounts (classified or unclassified) are identified, the FBI must then develop appropriate search terms to search within individual accounts. Since there is no index within FBI employees' e-mail accounts, terms must be designed to efficiently search all text of e-mails within employees' accounts. In doing this, the FBI also uses Boolean search limiters to craft appropriate searches of e-mail records.[9] This combination of terms and limiters allows the FBI to conduct e-mail searches for responsive records with a reasonable amount of effort.

THE FBI'S SEARCH FOR E-MAIL RECORDS

(56)   In this case, RIDS conducted a search to locate any e-mail records potentially responsive to Plaintiff's request. To locate e-mail records responsive to Plaintiff's request, RIDS searched the unclassified e-mail account of James Baker. Given that James Baker is the FBI employee who allegedly sent or received e-mail communications from outside third parties, RIDS searched within Baker's unclassified account. Other than Baker, the third parties listed in Plaintiff's request letter would not have classified government e-mail accounts and therefore RIDS determined a search of Baker's unclassified e-mail account to be the most logical location for responsive records.

---

[9] Commonly the FBI will use the Boolean search limiter "AND" between two search terms. This will limit results to documents containing both search terms. Additionally, the FBI uses "OR" between search terms to find documents that contain at least one of the search terms. Finally, and rarely, the FBI uses "NOT" between search terms to limit to documents that contain the first search term but not the second. For example, searching "investigation NOT robbery" would limit to documents containing "investigation," but not those documents that also contain the term "robbery."

(57)    Within Baker's unclassified e-mail account, RIDS searched e-mails created or
retrieved between January 1, 2016 and January 16, 2018 for e-mails that included in the
to/from/Cc/Bcc fields any of the following third party names:  Christopher Steele; Glenn
Simpson; Nellie Ohr; and David Corn.  This search yielded no responsive records not subject to
the FBI's privacy *Glomar* response.

## LEADS RESULTING IN ADDITIONAL SEARCH EFFORTS AND LOCATION OF RECORDS RESPONSIVE TO PLAINTIFF'S REQUEST

(58)    The FBI, while reviewing information relative to another FOIA request, located a
clear and certain lead to potentially responsive documents within a publicly available December
2019 U.S. Department of Justice, Office of the Inspector General Report entitled "Review of
Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation,"[10]
which contained the following information:

> Following the November 2016 U.S. elections, several third parties provided the FBI with
> additional Steele election reporting, which the FBI included in its validation efforts.
> Baker told the OIG that *Mother Jones* reporter contacted him and furnished him with nine
> reports from Steele, four of which Steele had not previously provided to the FBI.[11]  As
> described above, Baker was interviewed by Case Agent 1 and Baker's discussion with the
> *Mother Jones* reporter was documented in an FBI FD-302 report.  According to the FD-
> 302, Baker received a collection of Steele's reports from the *Mother Jones* reporter,
> which Baker forwarded to Priestap for analysis.[12]

[10] This report is available at https://www.justice.gov/storage/120919-examination.pdf (accessed
August 11, 2020).

[11] The nine Steele reports were Reports 80, 94, 95, 97, 105, 111, 112, 134 and 136.  The FBI had
not previously obtained Reports 97, 105 and 112 from Steele.  According to an FBI FD-302, in a
conversation later that month, the *Mother Jones* reporter advised Baker that Steele reports also
had been furnished to two Members of Congress, and that Steele was surprised that his reporting
had not received more attention in the media.

[12] The *Mother Jones* reporter has stated publicly that he provided Steele reports to Baker. *See* "A
New Right-Wing Smear Campaign Targets a Former FBI Official to Distract from Russia
Scandal," *Mother Jones*, www.motherjones.com/politics/2019/01/a-new-right-wing-smear-
campaign-targets-a-former-fbi-official-to-distract-from-russia-scandal. (accessed August 11,
2020).

(59)    Utilizing this lead the FBI conducted the following additional searches:

a)  a Sentinel indices search utilizing the name James Baker, restricted to only records indexed as FD-302s. This search yielded one record responsive to Plaintiff's request.[13]

b)  a search of Baker's and E. W. Priestap's unclassified FBI e-mail accounts for e-mails to/from James Baker and E. W. Priestap created or retrieved between November 1, 2016 and November 22, 2016 containing either the terms "Mother Jones," "Corn," or "Mother". This search yielded five responsive records: four copies of the same one-page email in which David Corn sent reports authored by Christopher Steele to James Baker's personal email account, who forwarded them to E.W. Priestap's unclassified FBI email account, who in turn replied to acknowledge receipt; and one copy of a second email in which E.W. Priestap sent the reports to others within the FBI.[14]

## JUSTIFICATION FOR NONDISCLOSURE UNDER THE FOIA

(60)    The FBI processed all documents responsive to Plaintiff's request, and not subject to its *Glomar* response, to achieve maximum disclosure consistent with the access provisions of the FOIA. Every effort was made to provide Plaintiff with all material in the public domain and with all reasonably segregable non-exempt information in the responsive records. No reasonably segregable, non-exempt portions have been withheld from Plaintiff. Further description of the

---

[13] The existence of this record was subject to the FBI's partial *Glomar* response until its existence was officially, publicly acknowledged in the IG Report.

[14] These records were stored in the unclassified FBI email account of E.W. Priestap; they were not stored in James Baker's unclassified FBI email account.

information withheld, beyond what is provided in this declaration could identify the actual exempt information that the FBI has protected.

(61)     The FBI identified and described four pages of the responsive records, and three duplicate pages, in the attached Index at (**Ex. J**).  It also prepared this declaration to provide justification for the FOIA exemptions used to withhold exempt information.  The index specifies the relevant Bates pages, provides a specific date range and description of each document, and identifies the applicable exemptions applied to the pages of each document.  Additionally, coded categories were applied to the exemptions detailing the nature of the information withheld pursuant to the provisions of the FOIA.  The coded categories are provided to aid in the Court's and Plaintiff's review of the FBI's explanations of the FOIA exemptions it asserted to withhold the material.  The coded, Bates-numbered pages together with this Index and Declaration demonstrate all information withheld by the FBI is exempt from disclosure pursuant to the cited FOIA exemptions, or is so intertwined with protected material that segregation is not possible without revealing the underlying protected documents.

(62)     Each instance of information withheld on the Bates-numbered documents is accompanied by a coded designation that corresponds to the categories listed below.  For example, if "(b)(7)(C)-1" appears on a document, the "(b)(7)(C)" designation refers to FOIA Exemption 7(C) protecting against unwarranted invasions of personal privacy.  The numerical designation of "1" following the "(b)(7)(C)" narrows the main category into a more specific subcategory, such as "Names and Identifying Information of FBI Special Agents and an FBI Employee Unique Employee Identification Number."  Listed below are the categories used to explain the FOIA Exemptions the FBI asserted to withhold the protected documents:

22

| SUMMARY OF FOIA EXEMPTION JUSTIFICATION CATEGORIES | |
|---|---|
| **CODED CATEGORIES** | **INFORMATION WITHHELD** |
| **Exemption 3** | **INFORMATION PROTECTED BY STATUTE** |
| (b)(3)-1 | National Security Act of 1947 [50 U.S.C. Section 3024(i)(1)] *[cited at all times in conjunction with (b)(7)(E)]* |
| **Exemptions 6 & 7(C)** | **CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY AND UNWARRANTED INVASION OF PERSONAL PRIVACY** |
| (b)(6)-1 and (b)(7)(C)-1 | Names and Identifying Information of FBI Special Agents and an FBI Employee Unique Employee Identification Number ("UEID") |
| (b)(6)-2 and (b)(7)(C)-2 | Name and Identifying Information of a Third Party Merely Mentioned |
| (b)(6)-3 and (b)(7)(C)-3 | Government Employee's Personal E-mail Address |
| **Exemption 7(E)** | **LAW ENFORCEMENT TECHNIQUES AND PROCEDURES** |
| (b)(7)(E)-1 | Confidential Human Source ("CHS") Program Information |
| (b)(7)(E)-2 | Sensitive Investigative File Numbers *[cited at all times in conjunction with (b)(3)]* |

### EXEMPTION (b)(3) INFORMATION PROTECTED BY STATUTE

(63)     5 U.S.C. § 552 (b)(3) exempts from disclosure information which is:

> Specifically exempted from disclosure by statute … if that statute (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (A)(ii) establishes particular criteria from withholding or refers to particular types of matters to be withheld; and (B) if enacted after the date of enactment of the Open FOIA Act of 2009, specifically cites to this paragraph.

(b)(3)-1 – NATIONAL SECURITY ACT OF 1947, 50 U.S.C. § 3024(i)(1)

(64)     The FBI asserted Exemption 3 to withhold information pursuant to Section 102A(i)(1) of the National Security Act of 1947 ("NSA"), as amended by the Intelligence Reform and Terrorism Preservation Act of 2004 ("IRTPA").[15]  50 U.S.C. § 3024(i)(1) provides that the Director of National Intelligence ("DNI") "shall protect from unauthorized disclosure intelligence sources and methods."[16]  As relevant to U.S.C. § 552(b)(3)(B), the National Security

---

[15] Upon further review, the FBI is no longer asserted Exemption 3 to the second paragraph on Bates page FBI(19cv00177)-2.

[16] Section 102A(i)(1) of the National Security Act was previously codified at 50 U.S.C.

Act of 1947 was enacted before the date of enactment of the OPEN FOIA Act of 2009. On its face this federal statute leaves no discretion to agencies about withholding from the public information about intelligence sources and methods. Thus, the protection afforded to intelligence sources and methods by 50 U.S.C. § 3024(i)(1) is absolute. See *CIA v. Sims*, 471 U.S. 159 (1985).

(65)    In order to fulfill its obligation of protecting intelligence sources and methods, the DNI is authorized to establish and implement guidelines for the Intelligence Community ("IC") for the classification of information under applicable laws, Executive Orders, or other Presidential Directives, and for access to and dissemination of intelligence. 50 U.S.C. § 3024(i)(1). In implementing this authority, the DNI promulgated Intelligence Community Direction 700, which provides that IC elements shall protect "national intelligence and intelligence sources and methods and activities from unauthorized disclosure."[17] The FBI is one of 17 member agencies comprising the IC, and as such must protect intelligence sources and methods.

(66)    Given the plain Congressional mandate to protect the IC's sources and methods of gathering intelligence, the FBI has determined that intelligence sources and methods would be revealed if any of the withheld information is disclosed to Plaintiff. Therefore, the FBI is prohibited from disclosing such information under § 3024(i)(1).[18]

---

§ 403(i)(1). As a result of the reorganization of Title 50 of the U.S. Code, Section 102A(i)(1) is now codified at 50 U.S.C. § 3024(i)(1).

[17] Intelligence Community Directive (ICD) 700, date June 7, 2012, at ¶ 2a.

[18] Although § 3024(i)(1) does not impose a requirement to articulate harm, disclosure of this information presents a bona fide opportunity for individuals to develop and implement countermeasures, resulting in the loss of significant intelligence information, sources, and methods relied upon by national policymakers and the IC to safeguard national security.

(67)     The FBI is asserting Exemption 3 in this case, in conjunction with Exemption 7(E), to protect unclassified information that would reveal intelligence sources and methods. Information was protected under Exemption 7(E) because unclassified sources and methods were employed as law enforcement techniques and procedures, or guidelines, and thus would qualify as both an intelligence source and method under Exemption 3 and a law enforcement technique under Exemption 7(E).  Notably, § 3024(i)(1) protects sources and methods regardless of whether they are classified.  *See Sims*, 471 U.S. at 176.

(68)     The FBI is invoking 50 U.S.C. § 3024(i)(1) to protect a certain file number assigned to a specific intelligence matter.  In this case, the FBI protected a file number pursuant to Exemption (b)(3) because release would reveal non-public details about the focus, character and nature of FBI national security activities.  Additionally, revealing information regarding the file classification number would also disclose the type of national security program generally associated with this type of investigation.  The unique file number assigned to this investigation is extremely sensitive, and prohibited from disclosure pursuant to 50 U.S.C. § 3024(i)(1).

(69)     The mere fact that a file number of a designated intelligence source and method file classification is connected to a particular subject/target reveals operational intelligence source and method activity within the ambit of § 3024 protection.  Per the expressed language of § 3024, Intelligence Community (IC) agencies,[19] "shall" protect intelligence sources and methods.  The protection afforded by § 3024 is absolute, and IC components lack the discretion to release intelligence source and method information regardless of classification level.

---

[19] The FBI is one of the 17 federal agencies comprising the Intelligence Community affording the FBI the authority to withhold exempted material pursuant to the NSA of 1947.  50 U.S.C., § 3003 (4)(H).

(70)     National Intelligence and the term "intelligence related to national security" refer to all such intelligence, regardless of the source from which derived and including information gained within or outside the United States....[20]

(71)     As further explained in ¶¶ 89-92 *infra*, individual file numbers contain the classification identifying the type of investigation/crime, an alpha associated to a specific investigative focus, the geographical prefix identifying the originating office, and the unique case number.  Release of intelligence file numbers would lead to exposure of the particular intelligence activity and method at issue and its nexus to a specific FBI intelligence program or sub-program.  Furthermore, disclosure of intelligence file numbers in the aggregate will enable an adversary to attribute any information released from the document to the particular file.  An adversary could then identify the specific intelligence activity applying a mosaic by supplying further missing pieces.  Hence, a particular mosaic of the activity begins to appear as more information is identified with the particular intelligence file leading to exposure of actual intelligence activities or methods.

## EXEMPTION 7 THRESHOLD

(72)     FOIA Exemption 7 exempts from mandatory disclosure records or information compiled for law enforcement purposes when disclosure could reasonably be expected to cause one of the harms enumerated in the subparts of the exemption.  See 5 U.S.C. § 552(b)(7).  Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes.  Any investigative records responsive to this request were compiled in furtherance of the FBI's law

---

[20] *See* United States Congress, Intelligence Reform and Terrorism Prevention Act of 2004, Section 1012, Public Law 108-458, December 17, 2004.

enforcement mission, and the processed records, in particular, were compiled in furtherance of a

pending investigation of a third party relating to potential violations of Federal Law.  Therefore,

the FBI determined these records readily meet the threshold requirement of Exemption (b)(7), as

discussed above in paragraphs 22 through 24.

### EXEMPTIONS (b)(6) AND (b)(7)(C) - CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY AND UNWARRANTED INVASION OF PERSONAL PRIVACY

(73)    Exemption 6 exempts from disclosure "personnel and medical files and similar

files the disclosure of which would constitute a clearly unwarranted invasion of personal

privacy."  5 U.S.C. § 552(b)(6).  All information that applies to a particular person falls within

the scope of Exemption 6.

(74)    Exemption 7(C) similarly exempts from disclosure "records or information

compiled for law enforcement purposes [when disclosure] could reasonably be expected to

constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).[21]

(75)    When withholding information pursuant to these two exemptions, the FBI is

required to balance the privacy interests of the individuals mentioned in the records against any

public interest in disclosure.   In asserting these exemptions, each piece of information was

scrutinized to determine the nature and strength of the privacy interest of every individual whose

name and/or identifying information appears in the documents at issue.  When withholding the

information, the individual's privacy interest was balanced against the public's interest in

disclosure. For purposes of these exemptions, a public interest exists only when information about

an individual, their name, or their identifying information would shed light on the FBI's

performance of its mission to protect and defend the United States against terrorist and foreign

---

[21] As stated in FN 4, *supra*, the practice of the FBI is to assert Exemption 6 in conjunction with Exemption 7(C).  The analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion.

intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide

leadership and criminal justice services to federal, state, municipal, and international agencies and

partners.  In each instance wherein information was withheld pursuant to Exemptions 6 and 7(C),

the FBI determined that the individuals' privacy interests outweighed any public interest in

disclosure.

### (b)(6)-1 AND (b)(7)(C)-1:  NAMES AND IDENTIFYING INFORMATION OF FBI SPECIAL AGENTS AND AN FBI EMPLOYEE UNIQUE EMPLOYEE IDENTIFICATION NUMBER ("UEID")[22]

(76)    Within Exemption Categories (b)(6)-1 and (b)(7)(C)-1, the FBI protected the

names and identifying information (*e.g.* official FBI e-mail addresses) of FBI Special Agents

("SAs"), and a UEID number assigned to an FBI professional staff employee.  First, the FBI

SA's were responsible for conducting, supervising, and/or maintaining the investigative activities

reflected in the documents.  These responsibilities include but are not limited to the following:

coordinating/completing tasks in support of the FBI's investigative and administrative functions,

compiling information, and/or reporting on the status of the investigation.

(77)    Assignment of SAs to any particular investigation are not by choice.  Publicity,

adverse or otherwise, arising from a particular investigation and/or use of specific FBI

investigative techniques, may seriously prejudice their effectiveness in conducting other

investigations or performing their day-to-day work.  The privacy consideration is also applied to

protect FBI SAs, as individuals, from unnecessary, unofficial questioning as to the conduct of

this or other investigations/investigative activities, whether or not they are currently employed by

the FBI.  FBI SAs conduct official inquiries into various criminal and national security violation

cases.  The publicity associated with the release of an SA's identity in connection with a

---

[22] UEIDs are singular numbers assigned to employees, and serve as a means of identification
within the government.

particular investigation/investigative activities could trigger hostility toward a particular SA. During the course of an investigation, a SA may engage with all strata of society, conducting searches and making arrests, both of which result in reasonable but nonetheless serious disturbances to people and their lives. Persons targeted by such investigations/investigative activities, and/or those sympathetic to those targeted, could seek to inflict violence on a SA based on their participation in an investigation. This is because an individual targeted by such law enforcement actions may carry a grudge against those involved with the investigation, which may last for years. These individuals may seek revenge on SAs and other federal employees involved in a particular investigative activity. There is no public interest served by disclosing the SA's identities or their official FBI email addresses because neither their identities nor their email addresses would, by themselves, significantly increase the public's understanding of the FBI's operations and activities. Thus, disclosure of this information would constitute a clearly unwarranted invasion of their personal privacy; and the FBI properly withheld the names and official FBI email addresses of FBI SAs pursuant to Exemptions 6 and 7(C).

(78)    Next, the FBI on the cover page of the FD-302, made one redaction, consisting of the UEID of an FBI Professional Staff employee involved in the classification review of the FD-302, pursuant to FOIA Exemptions (b)(6) and (b)(7)(C). This unique identifier could be used to identify the employee who reviewed this document. This, in turn, could subject the employee to targeted attempts to obtain sensitive information from the FD-302 or for other sensitive and/or classified FBI information to which they may have access due to their FBI employment. Furthermore, adversaries could co-opt the information in an attempt to impersonate the employee's identity in relation to agency business. As such the FBI determined this employee maintains substantial privacy interests in not having the UEID disclosed. In contrast, there is no

public interest in this singular piece of information because its disclosure would not significantly increase the public's understanding of the FBI operations and activities.  Accordingly, in the balance, this employee's privacy interests prevail and thus, the FBI properly withheld the UEID pursuant to FOIA Exemptions (b)(6) and (b)(7)(C).

### (b)(6)-2 AND (b)(7)(C)-2:  NAME AND IDENTIFYING INFORMATION OF A THIRD PARTY MERELY MENTIONED

(79)     In Exemption category (b)(6)-2 and (b)(7)(C)-2, the FBI protected the name and identifying information (*e.g.,* profession and personal e-mail address) of a third party who was merely mentioned in the investigative record responsive to Plaintiff's request.  This individual was not of investigative interest to the FBI.  This third party maintains substantial and legitimate privacy interests in not having this information disclosed and thus, being connected with an FBI law enforcement matter.  Considering the FBI is an investigative and intelligence agency, disclosure of the third party's name and/or identifying information in connection with FBI records carries an extremely negative connotation.  Disclosure of his/her identity would subject this individual to possible harassment or criticism and focus derogatory inferences and suspicion on him/her.  The FBI then considered whether there was any public interest that would override this privacy interest, and concluded that disclosing information about an individual who was merely mentioned in an FBI investigative file would not significantly increase the public's understanding of the operations and activities of the FBI.  Accordingly, the FBI properly protected this individual's privacy interests pursuant to FOIA Exemptions 6 and 7(C).  To protect the privacy interests of this individual, the FBI withheld a single paragraph consisting of two sentences from the FD-302 released in this case.  No information could be reasonably segregated from this paragraph without tending to identify the individual in question.

(b)(6)-3 AND (b)(7)(C)-3:  GOVERNMENT EMPLOYEE'S PERSONAL E-MAIL ADDRESS

(80)    In Exemption category (b)(6)-3 and (b)(7)(C)-3, the FBI protected the personal e-mail address of a person who, at the time the records were created, was a government employee, James Baker.  While no longer a government employee, this person maintained, and maintains, a substantial legitimate privacy interest in not having his/her personal e-mail address disclosed. Individuals, including those employed with government agencies, use personal e-mail addresses for corresponding with friends and family, receiving notifications for appointments, for receiving electronic monthly billing statements and financial bank statements and as a login name to access personal financial accounts and accounts of organizations with whom they are members. Government employees maintain personal lives separate from their professional lives, and the FBI categorizes its withholding, and makes withholding determinations of government employees' information, with respect of this fact.  If this fact was not considered, government employees would be reduced to one-dimensional personas in the eyes of FOIA, where they would never be acknowledged to exist outside of their official duties.  To put it another way, their personal email addresses or other personal information would be processed according to the same standards as their official government email addresses and thus more likely to be released.

(81)    When government employees are acting in their capacity as private individuals (*i.e.*, they are not conducting official government work); the considerations for their information should match the context in which they are mentioned.  Government employees have a reasonable expectation that government agencies will not make their personal contact information available to the general public.  Disclosure of this information would cause an unwarranted invasion of this government employee's privacy rights, as it would cause unwarranted harassment.  It could also allow individuals with intent on causing this government employee harm to use this address to impersonate or otherwise adversely affect his/her personal

31

life, which depending on the nature of one's actions, could also negatively impact this government employee's career.  Thus, the FBI determined Mr. Baker has a substantial privacy interest in not having his/her personal e-mail address disclosed to the public.

(82)     The FBI then considered whether there was a public interest that would override this former government employee's privacy interest.  Again, a public interest exists only when the information to be disclosed would significantly increase the public's understanding of the FBI's performance of its mission.  This government employee's personal e-mail address, by itself, sheds no light on the FBI's operations and activities.  In contrast, disclosing this personal information would not significantly increase the public's understanding of the FBI's performance of its mission, and so the FBI concluded there was no public interest to override this government employee's privacy interests.  Accordingly, the FBI properly protected this government employee's personal e-mail address pursuant to FOIA Exemptions 6 and 7(C).

## EXEMPTION (b)(7)(E) INVESTIGATIVE TECHNIQUES AND PROCEDURES

(83)     5 U.S.C. § 552(b)(7)(E) provides protection for:

> law enforcement records [which]…would disclose techniques and procedures for law enforcement investigations or prosecutions or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

(84)     Exemption (b)(7)(E) has been asserted to protect information from these records, the release of which would disclose techniques and/or procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law. This exemption affords protection to techniques and procedures used in law enforcement investigations; it protects techniques and procedures that are not well-known to the public, as well as non-public details about the use of well-known techniques and procedures.

(85)     Within the responsive documents, the FBI applied Exemption (b)(7)(E) to non-public investigative techniques and procedures utilized by the FBI to pursue its law enforcement and intelligence gathering missions, and also to non-public details about techniques and procedures that are otherwise known to the public.  Specifically, the FBI asserted Exemption 7(E) to protect the following categories of information.

(b)(7)(E)-1: CONFIDENTIAL HUMAN SOURCE ("CHS") PROGRAM INFORMATION

(86)     The FBI protected the non-public information about its CHS program, including techniques and procedures used in the operation of the program.  CHSs are an integral and crucial resource for the FBI in carrying out its law enforcement, national security, and intelligence gathering missions.  In order for the FBI to successfully fulfill these missions, it is essential for its CHS program to operate effectively, and in order for that to occur, non-public and sensitive program details must not be publicly disseminated.

(87)     Christopher Steele's codename was protected here.  A source codename is unique and assigned solely to a particular CHS.  Codenames are used in lieu of the actual name of the source.  Though Christopher Steele has been publicly confirmed as a former FBI CHS, his codename has never been officially publicly acknowledged.  Public disclosure of this unique identifier still presents a law enforcement circumvention risk as it would provide adversaries the means of tracking and discovering non-public, sensitive details about the FBI's use of information provided by Steele in its pursuit of investigative and counterintelligence activities.  This would allow adversaries to judge the utility of such information to the FBI and lay bare key information about the FBI's investigative and intelligence-gathering strategies for utilizing this information in any other investigations.  Release of this information would allow adversaries to gain knowledge about FBI investigative and intelligence-gathering strategies, predict future

investigative actions, and take steps to avoid detection and/or disruption by FBI investigative and intelligence-gathering efforts.

(88)   For the reasons described above, the FBI protected information about its CHS program under Exemption (b)(7)(E) to ensure the continued utility of this critical law enforcement technique and to prevent circumvention of the law.

(b)(7)(E)-2:  SENSITIVE INVESTIGATIVE FILE NUMBERS

(89)   In Exemption category (b)(7)(E)-2, the FBI protected sensitive investigative file numbers.  The FBI determined this Exemption is appropriate for protecting these file numbers as the release of file numbering convention identifies the investigative interest or priority given to such matters.  The file numbers the FBI protected are not known to the general public.  These file numbers contain three separate portions.  The first portion of these file numbers consist of FBI file classification numbers which indicate the types of investigative/intelligence gathering programs to which these files pertain.  Many of the FBI's classification numbers are public, which makes disclosure of this information even more telling.  Release of known file classification numbers in the context of investigative records would immediately reveal the types of investigations being pursued, and/or non-public facets of the FBI's investigative strategies.  For example, revealing the FBI has a money laundering investigative file on a subject who was only known to be investigated for crimes related to public corruption, would reveal key non-public information about the FBI's investigative strategies and gathered evidence.  Additionally, releasing non-public FBI file classification numbers would reveal critical information about non-public investigative techniques and procedures, and provide criminals and foreign adversaries the ability to discern the types of highly sensitive investigative strategies the FBI is pursuing

whenever such file classification numbers are present within these and other sensitive FBI investigative records.

(90)     The protected investigative file numbers also contain two-letter office of origination codes, indicating which FBI field office or overseas FBI legal attaché originated the investigations at issue.  Providing this information, in many instances, would provide critical information about where and how the FBI detected particular criminal behaviors or national security threats, and reveal key pieces about the FBI's non-public FBI investigations or intelligence/evidence gathering sources and methods.  Revealing this information could also risk disclosing unknown FBI investigations or intelligence gathering initiatives, by revealing interests in varying areas of FBI investigative responsibility.  Releasing this information could also possibly provide significant information about the FBI's failure to detect certain types of criminal behavior.  For example, a criminal operating out of San Francisco, California with ties to a criminal organization under investigation in the FBI's Seattle Field Office, could request the FBI's Seattle Field Office's investigative file.  If the FBI were to reveal all of the originating office codes in the investigative files present in Seattle's file, and there was no indication the FBI ever pursued an investigation in San Francisco, the criminal could reasonably assume the FBI failed to locate any evidence of their wrongdoing, emboldening them to continue their activities undeterred.

(91)     The third portion of these investigative files consists of the numbers given to the unique investigative initiatives these files were created to memorialize.  Releasing these singular file numbers would provide criminals and foreign adversaries with a tracking mechanism by which they can place particular files/investigations within the context of larger FBI investigative efforts.  Continued release of sensitive investigative file numbers would provide criminals with

an idea of how FBI investigations may be interrelated and when, why, and how the FBI pursued different investigative strategies. This would provide criminals with the means of judging where the FBI allocates its limited investigative resources, how the FBI responds to different investigative circumstances, what the FBI knows and when/how they obtained the knowledge, and if there are knowledge gaps in the FBI's gathered intelligence.

(92)   In summary, repeatedly releasing sensitive FBI investigative file numbers would allow determined criminals and foreign adversaries to obtain an exceptional understanding of the body of investigative intelligence available to the FBI; and where, who, what and how it is investigating certain detected activities. Release of this information would enable these criminals and foreign adversaries to predict FBI investigations and structure their behavior to avoid detection and disruption by FBI investigators, enabling them to circumvent the law. Accordingly, the FBI properly asserted FOIA Exemption 7(E), at times in conjunction with Exemption (b)(3), to protect this type of information.

## SEGREGABILITY

(93)   As discussed in ¶ 4 *supra*, the FBI identified twenty-eight (28) pages of responsive records subject to the FOIA. Of those pages, 21 pages were Released in Full ("RIF"), and 4 pages were Released in Part ("RIP"). Each of these categories is discussed below to further address segregability. In addition, 3 pages were duplicates of a page released in part. While the OIG report provides some information on the public record, the information protected herein cannot be reasonably segregated to any further extent without revealing exempt information.

(a)      Pages RIF.  Following the segregability review, RIDS determined 21 pages could

be released in full without redactions as there was no foreseeable harm to an interest

protected by a FOIA exemption.[23]

(b)      Pages RIP.  RIDS further determined 4 pages could be release in part with

redactions pursuant to specific FOIA exemptions identified on these pages and described

herein.  These pages comprise a mixture of material that could be segregated for release

and material that was withheld as release would trigger foreseeable harm to one or more

interests protected by the cited FOIA exemptions on these pages.

**CONCLUSION**

(94)      The FBI performed adequate and reasonable searches for responsive records

subject to the FOIA and processed all such records.  The FBI has processed and released all

reasonably segregable information from the responsive records to Plaintiff.  Information was

properly withheld pursuant to FOIA Exemptions (b)(3), (b)(6), (b)(7)(C), and (b)(7)(E).  The FBI

has determined that the information withheld from Plaintiff, if disclosed, would violate federal

statute governing release of information on national security operations, could reasonably be

expected to interfere with ongoing law enforcement proceedings, would cause a clearly

unwarranted invasion of the personal privacy; could reasonably be expected to constitute an

unwarranted invasion of personal privacy; or would disclose techniques and procedures for law

enforcement investigations.  Furthermore, the FBI appropriately issued an Exemption

(b)(6)/(b)(7)(C) *Glomar* response that neither confirms nor denies the existence or non-existence

of non-administrative records of communications of third parties, except to the extent such

---

[23] Some of these pages that were released in full have black boxes on them.  These black boxes
are not FBI redactions, but were already present on the copies received by the FBI.

records had previously been officially and publicly acknowledged, or could be officially,

publicly acknowledged without harming the privacy interests of such third parties.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct and Exhibits A through J attached hereto are true and correct copies.

Executed this 8th day of September 2020.

MICHAEL G. SEIDEL
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia